TEXAS & P. RY. CO. v. ARCHIBALD.

(Circuit Court of Appeals, Fifth Circuit. June 15, 1896.)

No. 444.

1. MASTER AND SERVANT—NEGLIGENCE—PERSONAL INJURIES.
   A switchman in a railroad yard was injured in uncoupling cars by reason of a defect undiscovered by him in one of the cars. Having sued the company for damages, the defendant asked the court to instruct the jury that, if they found it was the custom of defendant to inspect or repair cars brought, as these were, upon its road, to be loaded and returned, and if plaintiff knew this custom, or could have known it by the exercise of ordinary care, then he assumed the risk of any defects therein. The court gave the charge after striking out the words, "or could have known it by the exercise of ordinary care." *Held,* that there was no error in striking out these words.

2. SAME—DUTY TO INSPECT CARS.

In a personal injury case, *held*, that the court properly refused a request to instruct the jury that the duty to inspect cars coming from other roads applies only when the car is to be sent out on the receiving road, and does not apply when the cars are switched onto the road to be loaded and then returned to the road from which they were received.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

This was an action by Andy Archibald against the Texas & Pacific Railway Company to recover damages for personal injuries received by him while attempting to uncouple cars in the company's yard at Shreveport, La. In the court below plaintiff obtained a judgment for $5,000, and the defendant sued out this writ of error. The facts are stated in the opinion. The assignments of error were as follows:

"(1) The defendant requested the court to charge the jury as follows: 'If you believe that the defendant company had car inspectors at Shreveport, but that it was not their duty, under their employment, to inspect cars that came from other roads onto defendant's tracks merely for the purpose of being loaded and returned, and if the cars that the plaintiff was uncoupling when he was injured had been brought from the Cotton Belt road to be loaded with oil and returned to said road, and if the plaintiff knew, [or by the exercise of ordinary care could have known,] that it was the custom of the defendant company not to inspect cars that were brought in as they were to be returned, then plaintiff would be held to assume the risk of being injured by reason of defects in said cars, and in such case he cannot recover.' The court gave said charge after erasing the words between brackets as shown above. The court erred in making said erasure, and not giving said charge as requested, without any erasure.

"(2) The defendant requested the court to charge the jury as follows: 'It appears in this case that the plaintiff was injured while uncoupling two cars that did not belong to defendant company, but had been brought from the Cotton Belt road to be loaded and returned to that road. Now, if you believe it was a custom of defendant company not to inspect or repair cars when thus brought over to be loaded and returned, and plaintiff knew this custom, [or could have known it by the exercise of ordinary care,] then he assumed the risk of being injured by any defect in said cars, and cannot recover.' The court gave this charge after erasing the words between brackets, as shown above. The court erred in making this erasure, and in not giving said charge as requested, without any erasure.

"(3) The court erred in not giving the following charge, as requested by defendant: 'The duty to inspect cars coming from other roads applies only when the car is to be sent out on the receiving road, and does not apply when cars are switched from the road to be loaded and returned to the road from which they were received'

"(4) The court erred in refusing the following charge, requested by defendant: 'It is the duty of a railroad company to use ordinary care in keeping the cars which their employés are called on to handle in repair, so as not to expose their employés to unnecessary danger; and this duty exists to use ordinary care to inspect cars that come from other roads to be hauled over their road. What is ordinary care is always measured by the facts and circumstances of the particular case, and ordinary care means more care in one case than in another. The amount of care and caution to inspect cars coming from other roads, to be merely loaded and returned to the other road, is not so great as when the car is to be sent out on the road of defendant, because, in the first place, the car is to be handled only by switchmen, who have a much better opportunity to observe any defect, and protect themselves, than the trainmen do when a car is placed in a train and sent out on the road. Now, if the defendant used ordinary care to dis-

cover and repair defects in the car in question, under the circumstances in this case, then defendant is not liable.'

"(5) The court erred in refusing the following charge, requested by the defendant: 'That, in the absence of any evidence on the point, it would be presumed, from the circumstances of this case, that the plaintiff knew the custom of the defendant not to inspect cars in Shreveport yard that were switched from other yards to be loaded and returned to the road from which they came.' "

### T. J. Freeman and F. H. Prendergast, for plaintiff in error.

(a) When a servant enters into the employment of another, he assumes all the risks ordinarily incident to the business. He is presumed to have contracted in reference to all the hazards and risks ordinarily incident to the employment. Consequently he cannot recover for injuries resulting to him therefrom.

(b) The servant takes the risk of the master's mode of conducting his business, though a safer one might be followed, if the servant duly knows, or could by the exercise of ordinary care have known, the risk, and continues to work.

(c) There are risks and dangers incident to most employments, those risks the parties have in view when engagements for services are made, and in consideration of which the rate of compensation is fixed. In all engagements of this character the servant assumes those risks that are incident to the service, and, as between himself and the master, he is supposed to have contracted on those terms; and if an injury is sustained by the servant in that service, it is regarded as an accident, and the misfortune must rest on him.

Wood, Mast. & Serv. (2d Ed.) § 326; 3 Wood, R. R. p. 1452, § 370; 14 Am. & Eng. Enc. Law, bottom page 843, § 23, under head of "Master and Servant"; also, bottom page 845, under subhead "Master's Business Methods"; Railway Co. v. Minnick, 6 C. C. A. 387, 57 Fed. 362, 368; Tuttle v. Railway Co., 122 U. S. 189, 7 Sup. Ct. 1166; Randall v. Railway Co., 109 U. S. 478, 3 Sup. Ct. 322; Railway Co. v. Conrad, 62 Tex. 627; Woodworth v. Railway Co., 18 Fed. 282; Railway Co. v. Somers, 71 Tex. 700, 9 S. W. 741; Green v. Cross, 79 Tex. 130, 15 S. W. 220; Naylor v. Railway Co. (Wis.) 11 N. W. 24; Wonder v. Railway Co., 32 Md. 411; Crilly v. Railway Co. (La.; Jan. 4, 1892) 10 South. 400; Kohn v. McNulta, 147 U. S. 238, 13 Sup. Ct. 298.

### J. Henry Shepherd and James Turner, for defendant in error, contended:

(1) Text writers and all the courts of the Union have consecrated the humane doctrine that it is the duty of the master to furnish his servants with tools and appliances reasonably safe for the purpose for which they are intended. Whart. Neg. §§ 209, 211; Ror. R. R. p. 1211; Cooley, Torts, 561; Hough v. Railway Co., 100 U. S. 215; Loughlin v. State, 105 N. Y. 159, 11 N. E. 371; Wright v. Railway Co., 25 N. Y. 565.

(2) The duty to furnish safe cars cannot be delegated, but it is an absolute duty, required of the master, which he cannot avoid. Ford v. Railway Co., 110 Mass. 240, 260; Corcoran v. Holbrook, 59 N. Y. 517; Railway Co. v. McElyea, 71 Tex. 386, 9 S. W. 313, in point; Railway Co. v. Snyder, 152 U. S. 684, 14 Sup. Ct. 756.

(3) A railway company is liable for any injury to its servants from having required them to work with unsafe cars, and it is negligence, as a matter of law, for a company to place unsafe cars on its road when an inspection would have shown the danger. Eddy v. Prentice (Tex. Civ. App.) 27 S. W. 1063, in point.

### Duty of Inspection.

(4) "Due care requires him [the master], especially in the use of dangerous appliances, either himself or by some other selected for that purpose, to inspect and look after the condition of such appliances and see that they are kept in repair. This duty, when the character of the business is such as to require it, is imperative, and must be continuously and positively per-

formed." Bailey, Mast. Liab. p. 101; Railroad Co. v. Herbert, 116 U. S. 652, 6 Sup. Ct. 590, in point.

(5) A railroad company is under a legal duty not to expose its employés to dangers arising from such defects in foreign cars as may be discovered by reasonable inspection before such cars are admitted into its train. Railroad Co. v. Mackey, 157 U. S. 73, 15 Sup. Ct. 491; Hough v. Railway Co., supra; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590; Gottlieb v. Railroad Co., 100 N. Y. 462, 3 N. E. 344; Railway Co. v. Crenshaw, 71 Tex. 340, 9 S. W. 262.

Before McCORMICK, Circuit Judge, and BOARMAN and SPEER, District Judges.

BOARMAN, District Judge. On 29th day of January, 1894, Andy Archibald, defendant in error, while he was in the employment of said railway company, the plaintiff in error, as a switchman in the said company's yards at Shreveport, La., had his arm mashed, and in consequence of such injury he lost his arm. The defendant in error instituted his suit to recover damages against the plaintiff in error in the state district court of Harrison county, Tex. The cause was removed to and tried in the United States circuit court for the eastern district of Texas. The defendant in error recovered judgment against said railway company for $5,000, from which said judgment the said railway company prosecutes the writ of error.

Plaintiff's petition alleges that on or about the 20th day of January, 1894, he was in the employment of the said Texas & Pacific Railway Company, as a switchman in its yards at Shreveport, La., under the immediate orders of the yardmaster of said defendant, one Howell, and was on that day performing his duties in the said yard, working under the orders of the yardmaster, Howell. He shows that Howell had control of plaintiff and all switchmen in said yard, and they were by the rules of the service bound to obey orders of Howell. He shows that said company also keeps at Shreveport an officer called the "car inspector," whose duty it is to inspect all cars that come into said yard, whether they come in over the defendant's railway, or some other connecting road, as soon as the cars come into the yard, and to mark such cars as may be out of fix in any of their appliances, so that the trainmen or switchmen may know, at the time they come to handle the car, whether it is safe or unsafe to handle, and, for the purpose of advising the trainman or switchman of their condition, writes on both sides of the car with chalk the letters "B. O.," which means that the car is in bad order, but on cars that are safe to handle he writes nothing at all, and by these marks the train and switch men know that a car is in or out of fix when they come to handle it; that there is at Shreveport a cotton seed oil mill, and on this track cars to be loaded or unloaded at the oil mill are placed, and, when ready, they are moved from the oil mill track out upon the main yard track; that on January 20, 1894, three cars were pulled out from the oil mill track on to the main yard track, and plaintiff was ordered by Yardmaster Howell to uncouple two of these cars, both being oil tank cars belonging to the American Cotton Seed Oil Company, and marked A. C. O. and Nos. 351 and 383, and both provided with patent pin pullers, which are attached to the end of

the cars, having a lever by means of which the coupling pin can be drawn from or inserted in the drawhead without the switchman being required to go in between the cars, as he has to do with cars not provided with pin pullers, which also makes it more difficult to pull out the pins when for any cause the pin pullers are out of fix.

He shows that, when he went to pull the pin, he found that the pin pullers on both cars were out of fix, and could not be worked, and that, in order to obey the orders of the yardmaster, he was compelled to reach over the castings that formed a part of the pin puller, in order to reach and pull the pin with his hand, after the usual fashion of doing that kind of work; the castings on each side of the drawhead making it somewhat more difficult to reach and pull the pin than in cars that were without such appliances. He shows that, while he was pulling the pin, and while the cars were moving slowly, as is usual and customary in coupling cars, he was struck on the leg by an iron rod from the rear car, and which fastened the brake beam to the brake staff, and which had come loose from its fastenings; that this iron rod had on the end a chain about 12 inches long, and was by the motion of the car pushed out in front of the car about 3 feet, into the space between the two cars and about 6 inches from the ground; that, as he was pulling the pin, this rod struck his leg, and was liable to trip him up, and, in attempting to avoid being thrown down by the rod, his arm was caught between the castings on the drawhead, crushing the bones at, above, and below the elbow joint of his right arm, and injuring same to such an extent that amputation of the right arm became necessary to save his life; that he did not know that the cars were out of condition until he went to uncouple them, when he discovered that the pin pullers of both cars were out of order, and that, as he would have to uncouple them as if they had no pin pullers, by going between the cars and pulling the pin with his hands, and as he did not know of the iron rod being loosened from the brake beam until it struck him on the leg, and until the loose chain and hook on the protruding end were about to trip him up; that he could not obey the order of the yardmaster to uncouple the cars without doing just as he did, by pulling the pin with his hands, which is the usual and customary way of uncoupling cars, and practically without any danger. But he shows that the loose rod, protruding from the rear car, and striking against his feet, greatly enhanced the danger, because it was liable to trip him, or the loose chain and hook were liable to catch his foot and leg, and throw him down between the cars, and in endeavoring to avoid the danger from the loose rod and chain his arm was caught, as before charged, and crushed. He shows: That these cars had been in the yard for over a day, and there was no mark of any kind on either to indicate that they were not in perfect order, and he did not know or believe that he was incurring more than ordinary danger of the service in obeying the order of his superior in uncoupling said cars, and while he did see the pin pullers on both cars were out of fix and could not be worked, yet the danger of uncoupling without them was not greater than is usual in uncoupling cars not provided with pin pullers. Not one car in fifty in use are provided with pin pullers,

but are coupled and uncoupled by hand. That his injury was not caused by the pin pullers being out of fix, but was caused by the loose rod striking against his feet, and to avoid being thrown down he was forced to turn his attention to the rod, and in endeavoring to avoid that danger his arm was caught between the castings on the drawhead and crushed as aforesaid. That he was not at fault, and was injured by the gross negligence of the defendant in failing to inspect and repair its said cars, and in failing to fasten the rod to the brake, and in failing to notify the plaintiff that said rod was loose from its fastenings, and liable to trip and throw him down while he was uncoupling said cars. That the bones of his arm above and below the elbow were crushed to pieces, and the joint was mashed until the crushed bones protruded through the flesh and skin, and the arm had to be amputated above the elbow to save the life of petitioner, and that in consequence he has been deprived of the use of his right arm. That at the time of his injury he was 23 years of age, and was healthy, strong, and active, and able to do any amount of hard work. That he had been working as a brakeman and switchman on railroads for 4 or 5 years, and had adopted that business as a means of livelihood. That he was earning at the time he was hurt about $75 per month, and his prospects were good for much larger wages as he grew older and had more experience in the business in which he was engaged, but that the loss of his right arm totally prevents him from following the business in which he was engaged, and also from following any other business. That he is not an educated man, and cannot earn anything except by manual labor.

The plaintiff in error filed in the state court a general denial, and, in answering further, alleged that, if there were any of the defects complained of in plaintiff's petition, the same were known to him, and that he assumed the risk thereof.

The transcript shows, in aid of the bill of exception, all the evidence administered by either side to the jury. There seems to have been but little, if any, conflict in the testimony upon the material issues of fact, and the verdict of the jury and the judgment thereon seem to be fully sustained by the evidence.

The errors assigned are to the charge of the court. They relate to the charges given as well as to the charges tendered by the counsel for plaintiff in error and refused by the court. We have carefully examined the several assignments of error filed by plaintiff in error, together with the evidence shown in the transcript, in the light of the authorities cited in counsel's briefs, and we find no errors alleged in any of the several assignments sufficient to warrant us in reversing the judgment of the circuit court. Therefore, the same is affirmed.